**ETTEN v. LOVELL MFG. CO. et al.**
**Civil Action No. 55.**

United States District Court
W. D. Pennsylvania.

Feb. 28, 1949.

See also, D.C., 4 F.R.D. 233.

Charles F. Meroni, Carlton Hill, and George E. Frost (of firm of Charles W. Hills), all of Chicago, Ill., and Isaac J. Silin (of firm of Brooks, Curtze & Silin), of Erie, Pa., for plaintiff.

H. C. Lord and Ralph Hammar, both of Erie, Pa., for defendants.

FOLLMER, District Judge.

This action was predicated upon a complaint to authorize issuance of patent and

for declaratory judgment for injunction and damages and was brought by Nicholas L. Etten, a resident of the State of Iowa, against Lovell Manufacturing Company, a Pennsylvania corporation, and Walter L. Kauffman, II, a resident of the State of Pennsylvania.

The complaint was brought under Section 4915 of the Revised Statutes, 35 U.S. C.A. § 63, and alleged, inter alia, that Nicholas L. Etten, hereinafter called "Etten," on December 23, 1932, filed in the United States Patent Office an application for Letters Patent on his invention of certain improvements in wringers, Serial No. 648,620, on which application Letters Patent No. 2,054,970 was duly granted on September 22, 1936. That Etten filed an application for reissue of the said patent on October 7, 1937, Serial No. 167,775.

That on September 3, 1935, Etten filed in the United States Patent Office an application for Letters Patent on his invention of certain improvements in wringer release mechanism, Serial No. 38,932.

That on October 25, 1934, Gustave H. Jantz, since deceased, alleging to be the inventor of certain improvements in wringers, filed an application for Letters Patent of the United States, Serial No. 749,977, the legal title to which application was assigned to Lovell Manufacturing Company, hereinafter called "Lovell," this assignment being subsequently recorded in the United States Patent Office.

That on February 15, 1938, the Commissioner of Patents declared an interference, No. 75,433, between the Etten application, Serial No. 38,932, filed September 3, 1935, and the Jantz application, Serial No. 749,-977, filed October 25, 1934, the issue of which interference comprised the following count:

"In a wringer, a frame, rolls mounted in the frame, a removable top bar on the frame, pressure means between the top bar and the rolls, means for detachably securing one end of the bar to the frame, securing means between the other end of the bar and the frame comprising a toggle with one link pivoted to the frame, the other link pivoted to the bar and to said first link, and having an extension forming a handle for manipulating said toggle, the construction being such that the pivots of said links may be brought close to but short of a straight line position, whereby pressure between the bar and the frame will bias said toggle into a released position, and latching connections between said frame and said extension to secure said toggle in a pressure retaining position."

That thereafter, on April 25, 1939, the Commissioner of Patents declared an interference, No. 76,987, between the Etten reissue application, Serial No. 167,775 and the Jantz application, Serial No. 749,977, the issue of which interference comprised the following counts:

"In a wringer, a frame, rolls mounted in the frame, a removable top bar on the frame, pressure means between the top bar and the rolls, means for detachably securing one end of the bar to the frame, securing means between the other end of the bar and the frame comprising a toggle with one link pivoted to the frame, the other link pivoted to the bar and to said first link, the construction being such that the pivots of said links may be brought close to but short of a straight line position, whereby pressure between the bar and the frame will bias said toggle into a released position, and latching means to secure said toggle in a pressure retaining position."

"In a wringer structure in combination a frame having upright portions, wringer rolls supported by the upright portions of said frame, a separable cross head member supported by said upright portions, adjustable spring means carried by said cross head member for normally holding said wringer rolls in pressure contact, toggle link mechanism having inseparable members for retaining said cross head member in normal working position and joining the cross head to at least one of the upright portions, a movable latch member for holding the toggle mechanism in operable relation when retained in holding position and so that the pressure load is divided between the toggle mechanism and latch, said spring means being operable to move the toggle mechanism when the latch is not retained in holding position whereby the pressure between the rolls is released."

"In a wringer mechanism, in combination, wringer rolls, an adjustable pressure sustaining means therefor which is retained at one end partly by toggled links and partly by a removable hook, which hook is adapted to be removed from its pressure supporting position by the operation of one or more hand rails disposed adjacent the wringer rolls."

That after hearing on said Interferences No. 75,433 and No. 76,987, the Examiner of Interferences of the Patent Office awarded priority therein to Jantz. That on appeal the decision of the said Examiner was affirmed by the Board of Appeals of the United States Patent Office. That no appeal has been taken by the plaintiff on either of said Interferences, No. 75,433 or No. 76,987, to the United States Court of Customs and Patent Appeals to review the decision of the Board of Appeals. That in the said interferences the defendants, Walter L. Kauffman, II, hereinafter called "Kauffman," Lovell, and their assignor, Jantz, conspired in the concealment of material evidence, put in evidence false and untrue testimony as to material facts, knowing the same to be false and untrue and with the intention that they be relied upon by the United States Commissioner of Patents, the Examiner of Interferences, and the Board of Appeals of the United States Patent Office; that the said officials did rely upon said false and untrue testimony, resulting in the awarding of priority of invention of the subject matter of said interferences to the said Gustave H. Jantz.

The answer denies that plaintiff has a right to maintain an action under Section 4915 of the Revised Statutes, 35 U.S.C.A. § 63, and further asserts that "Defendants can find no complaint for declaratory judgment." Defendant further contends that plaintiff by taking an appeal to the United States Court of Customs and Patent Appeals under Section 4911 of the Revised Statutes, 35 U.S.C.A. § 59a, in Interferences Nos. 77,671 and 77,672, having the same record as Interferences Nos. 75,433 and 76,987, has waived his right to proceed under Section 4915 and that the plaintiff is estopped here because of the adjudica-

tion of the Court of Customs and Patent Appeals.

On October 21, 1947, in view of the fact that subsequent to the filing of the original action under Section 4915 the "Jantz" patent had been issued, the plaintiff moved to include an action under Section 4918, 35 U.S.C.A. § 66. Accordingly, the plaintiff was permitted to amend his Bill of Complaint on his motion setting forth that on September 3, 1946, Jantz's application, Serial No. 749,977, filed October 25, 1934, issued to defendant, Lovell Manufacturing Company, as Letters Patent No. 2,406,951; that said patent is in direct conflict with plaintiff's Letters Patent No. 2,054,970, hereinabove referred to.

Defendant then filed a supplemental answer (paragraphs 26 to 29 inclusive) and counterclaim for patent infringement (paragraphs 30 to 34 inclusive).

Paragraph 26 averred that Jantz was the first inventor of the invention defined in his Patent No. 2,406,951 issued September 3, 1946, on application Serial No. 749,977, filed October 25, 1934.

Paragraph 27 averred the unpatentability of claims 5 and 6 of Etten Patent No. 2,054,970.

Paragraph 29 averred plaintiff could not assert claims 2, 5, and 13 of his Patent No. 2,054,970 under Revised Statutes 4918, or, in the alternative, plaintiff must dismiss his cause under Revised Statutes 4915 before asserting his cause under Revised Statutes 4918.

Plaintiff moved to strike paragraphs 27, 28, and 29 of the supplemental answer aforesaid.

On December 8, 1947, plaintiff filed motion to dismiss under Federal Rules of Civil Procedure, Rule 12(b), 28 U.S.C.A., defendants' counterclaim for patent infringement.

After argument had and with the agreement of counsel, the Court, on December 9, 1947, ordered:

1. That motion is denied as to paragraphs 28 and 29 upon express understanding of defendants' counsel that as to the subject matter of these paragraphs no further testimony, evidence or argument would be adduced, but as to the defenses raised

therein defendants would rest solely on their case previously presented.

2. That motion is granted as to paragraph 27 with the understanding defendants are not to be prejudiced thereby from raising the same defense of unpatentability as to claims 5 and 6 of Etten Patent No. 2,054,970, or any reissue in any suit that may hereafter be brought by the parties for patent infringement.

3. The order, carrying the signed approval of counsel for plaintiff and defendants, further stated, "It is further understood that both parties hereto have concluded their respective cases as to the original and amended complaint and that no further evidence or testimony will be adduced herein in connection with the causes of action of said original and amended complaints."

At the hearing it was agreed that in the event plaintiff's motion to dismiss the counterclaim for patent infringement (paragraphs 30 to 34 of defendants' supplemental answer) were refused, the proper procedure would be to direct a separate trial which would necessitate the taking of additional testimony, and with that understanding, the case, exclusive of the counterclaim, was closed.

On December 19, 1947, plaintiff filed notice and supplemental affidavit in support of his motion to dismiss counterclaim.

On December 30, 1947, defendants filed a request to defer decision on the 4915 and 4918 actions until the status of the plaintiff, Etten, is clarified; that the Chamberlain Corporation is the party in interest, and that accordingly the absence of indispensable parties goes to the jurisdiction of the Court. In support thereof, defendants filed therewith a paper purporting to be uncertified excerpts from sworn statements of Etten in Public Use Proceedings, Nicholas L. Etten v. Gustave H. Jantz, involving Jantz application Serial No. 749,977 (forming part of affidavit of Ralph Hammer); affidavit of Ralph Hammer; also interrogatories to plaintiff, and notice to counsel for plaintiff of the filing by defendants of the said motion and related papers.

On January 9, 1948, plaintiff filed motion to strike under Rule 12(f) defendants' notice of December 30, 1947, together with the papers referred to therein and attached thereto.

Findings of Fact

1. The complaint, as amended, sets forth claims under Section 4915, R.S., 35 U.S.C.A. § 63, and Section 4918, R.S., 35 U.S.C.A. § 66.

2. The parties hereto had previously been involved in a series of four co-pending Patent Office Interferences, including the two here involved, Nos. 75,433 and 76,987, first declared on February 15, 1938, and April 25, 1939, respectively, and two not here specifically involved, Nos. 77,671 and 77,672, first declared on November 8, 1939.

3. The Jantz application, Serial No. 749,977, filed on October 25, 1934, which issued after the filing of this suit into Letters Patent No. 2,406,951 on September 3, 1946, was involved in all four of these interferences. The Etten reissue application, Serial No. 167,775, was involved only in Interference No. 76,987. Etten's application, Serial No. 38,932, filed on September 3, 1935, was involved in Interference No. 75,433, which includes only a single count or claim here in suit, and was also involved in Interference No. 77,671. Etten Patent No. 2,054,970 was involved in Interference No. 77,672.

4. Interferences Nos. 77,671 and 77,672, not here in suit, were declared after October 5, 1939, and were subject to the provisions of the United States Statutes, Section 4904, R.S. and Section 4911, R.S., 35 U.S.C.A. §§ 52 and 59a, as amended on August 5, 1939, c. 451, § 3, 53 Stat. 1212, and Section 4915, R.S. as well as 4904 and 4911, R.S., since all three statutes were amended.[1]

5. Interferences Nos. 76,987 and 75,433, the four counts or claims of which are here specifically in suit, were declared prior to October 5, 1939, and were subject to the laws in force and effect prior to the above said amendment of the Revised Statutes 4904, 4911, and 4915.

6. By stipulations filed in the Patent Office proceedings it was agreed that depositions on behalf of Etten taken September 9,

[1] The Act of August 5, 1939, became effective two months after its approval. See Footnote 35 U.S.C.A. § 52.

1940, might be used in evidence as to both Interferences Nos. 75,433 and 77,671,[2] and also as to Interferences Nos. 77,987 and 77,672;[3] and that the depositions on behalf of Jantz taken October 28, and 29, 1940, might be used in all four of the above interferences.[4]

7. The Patent Office Examiner of Interferences considered the testimony before him in connection with Interferences Nos. 75,433 and 76,987 here involved, and on April 23, 1942, awarded priority to Gustave H. Jantz.

8. Interferences Nos. 77,671 and 77,672, not here involved, were not decided by the Examiner of Interferences but were decided by the newly created Board of Interference Examiners which Board, in a decision dated April 23, 1942, awarded priority to Gustave H. Jantz.

9. Nicholas L. Etten, the losing party in Patent Office Interferences Nos. 75,433 and 76,987 here involved, duly took an appeal to the Patent Office Board of Appeals and that tribunal on April 24, 1943, affirmed the decision of the Examiner of Interferences awarding priority to Gustave H. Jantz. The decision of the Board of Interference Examiners in the two companion Interferences Nos. 77,671 and 77,672 not here involved, which came under the new amended practice were not appealable to the Board of Appeals as such an appeal under the amended practice was no longer provided for, and Nicholas L. Etten, the plaintiff herein, appealed the decisions to the Court of Customs and Patent Appeals under Section 4911 R.S. as amended.

10. The Court of Customs and Patent Appeals decided the appeals in Etten v. Jantz, 142 F.2d 680, 31 C.C.P.A., Patents, 1177, Interferences Nos. 77,671 and 77,672, not here involved, on January 3, 1944, solely on the basis of the record before the Patent Office Board of Interference Examiners and affirmed that Board's award of priority in favor of Gustave H. Jantz.

11. The Patent Office Examiner of Interferences, the Board of Interference Examiners, the Board of Appeals, and the United States Court of Customs and Pat-

ent Appeals did not in the aforesaid decisions, as to any of the four interferences including the two here involved, have before them the new and additional evidence adduced by plaintiff during the trial of this case.

12. As to Interferences Nos. 75,433 and 76,987 involved in this suit, the plaintiff elected under the applicable statutes Sections 4911 and 4915, unamended, not to take an appeal as to these two interferences but instead plaintiff filed this suit in equity under Section 4915 and had a trial de novo before this Court.

13. The counts or claims of Interferences Nos. 75,433 and 76,987 involved in this suit under Section 4915, R.S., are directed to different inventions than the counts or claims of the two companion Interferences Nos. 77,671 and 77,672 decided by the Court of Customs and Patent Appeals; and the tribunals in the Patent Office which decided the issue in the interferences here in suit (Nos. 75,433 and 76,987) were entirely different from the tribunal that passed on the issue of the two later Interferences Nos. 77,671 and 77,672.

14. At the time of the filing of this suit, the aforesaid Jantz application, Serial No. 749,977 (now issued as Letters Patent No. 2,406,951) was assigned to and admittedly owned by defendant Lovell, and each of the aforesaid Etten applications were owned by the plaintiff herein (Plaintiff's Exhibits Nos. 139 and 140.)

15. H. C. Lord, of Counsel for defendant, prior to the taking the Patent Office Interference testimony on behalf of the party Jantz, negotiated with the aged Jantz, now deceased, to acquire the Jantz application, and purchased the application on March 16, 1938, for defendant Lovell on an installment plan wherein the final payment of $1500 to Jantz was contingent upon either Jantz or Kauffman being finally adjudged to be the first inventor of the toggle release wringer.

16. The assignment from Jantz to Lovell (Plaintiff's Exhibit No. 31) was not, however, recorded until April 30, 1942, which was not only after the testimony of

---

2 Plaintiff's Exhibit No. 152, Page 4.
3 Plaintiff's Exhibit No. 153, Page 4.
4 Plaintiff's Exhibit No. 155, Page 2, and Plaintiff's Exhibit No. 156, Page 2.

Jantz was taken on October 28, 1940, by and with the assistance of A. F. Herbsleb, Attorney for Jantz, whose services were retained by H. C. Lord to assist in preparing the testimony of Jantz, but actually seven days after the date of decision of the Examiner of Interference in Interferences Nos. 75,433 and 76,987, and of the Board of Interference Examiners in Interferences Nos. 77,671 and 77,672.

17. Defendants had knowledge of the plaintiff Etten's effective application filing date of December 23, 1932, prior to the filing of sworn-to preliminary statements by Jantz in the Patent Office Interference, setting forth the dates of invention on which Jantz would rely.

18. The original preliminary statement (Plaintiff's Exhibit No. 166) executed by Jantz on March 16, 1938, setting forth a date of invention of March 1, 1933, were concealed in the files of H. C. Lord, Attorney for defendants, because the dates alleged therein were subsequent to Etten's filing date of December 23, 1932, and at no time were produced during the Patent Office Interferences.

19. While previous to this trial the records of defendants and their counsel had been produced with the statement by defendants' counsel that they were the complete records, nevertheless, defendants' counsel was still concealing and suppressing the Jantz original preliminary statements (Plaintiff's Exhibit No. 166) dated March 16, 1938; and this suppression was continued by defendants and their counsel until the last day of the trial, and the statements were even then produced only under compulsion and in an effort to avoid having Mr. Lord appear in person in response to the subpoena and the repeated requests of this Court that he appear and testify at the trial.

20. Subsequent to the execution of these original concealed statements, defendant Kauffman contacted the aged Jantz and by coercive tactics induced him to sign an amended preliminary statement setting forth earlier dates of invention.

21. The Patent Office records in connection with the interference proceedings include sworn affidavits of Gustave H. Jantz and A. F. Herbsleb (prepared and submitted by the defendants' Attorneys) positively representing that all of the records of the Corcoran Manufacturing Company had been destroyed, although various Corcoran Manufacturing Company records, including Exhibits Nos. 52 and 53, bearing dates of June 13, 1933, and November 17, 1933, were actually in the files and records of H. C. Lord, the Attorney for the defendants, and fully available at the time of the execution and filing of these false affidavits in the Patent Office.

22. Jantz's Exhibit "O" has now been conclusively shown not to have been in existence in the Spring of 1932, as testified to in the Patent Office proceedings, but instead to have been made in 1933.

23. Plaintiff completed the inventions of the counts or claims here in suit at least as early as the Fall of 1932, at which time these inventions were reduced to practice at the plant of the Chamberlain Corporation of Waterloo, Iowa, and which culminated in the December 23, 1932, application of Etten Patent No. 2,054,970.

24. Jantz did not complete his Exhibit "O" nor reduce his inventions to practice until sometime in the month of April, 1933.

25. As between the parties to this suit, the plaintiff, Etten, is entitled to priority on the subject matter of his application for reissue, Serial No. 167,775, here in suit, and of the subject matter of his application, Serial No. 38,932, here in suit, and which subject matters include the three counts of Interference No. 76,987 and the single count of Interference No. 75,433.

26. Gustave H. Jantz Letters Patent No. 2,406,951 embraces subject matter including claims such as and like claims 2 and 13, which are in direct conflict and in interference with plaintiff's Letters Patent No. 2,054,970 (on which application for reissue Letters Patent is pending), so that as to any and all such conflicting subject matter the plaintiff is entitled to priority as between the parties to this suit.

27. The issuance of Jantz Letters Patent No. 2,406,951 assigned to the defendant, Lovell, was fraudulently procured by the defendants when they knowingly and deliberately submitted and caused to be submitted to the Patent Office false and untrue evidence and affidavits while concealing and

suppressing other pertinent evidence in the files of their Attorneys, H. C. Lord and A. F. Herbsleb.

### Conclusions of Law

1. The Court has jurisdiction over plaintiff's claims under Section 4915 and Section 4918.

2. This proceeding is a trial de novo in equity in which the trial court is charged with the responsibility of considering all competent evidence, new and old.

3. The burden is upon the plaintiff in this suit to prove by more than a mere preponderance of evidence that the Patent Office was in error in awarding priority of invention on all counts in Interferences Nos. 77,671 and 77,672 to Gustave H. Jantz.

4. The decisions of the Patent Office in Interferences Nos. 77,671 and 77,672 create no estoppels against the issues of the present action.

5. The decision of the Court of Customs and Patent Appeals in Interferences Nos. 77,671 and 77,672 are not res adjudicata as to the issues of the present action.

### Discussions of Law

The first question requiring decision in this cause is whether plaintiff having appealed Interferences Nos. 77,671 and 77,-672 to the Court of Customs and Patent Appeals is estopped from bringing his Bill in Equity under Section 4915, Revised Statutes, as to Interferences Nos. 76,987 and 75,433. Defendants' Counsel seek to simplify the problem, stating in their brief: "The issue of fact decided by the C.C.P.A. was

that Jantz Exhibit O was completed and reduced to practice at least as early as April 10, 1932. The earliest date Etten contends for is May 2, 1932. Upon these facts, Etten is obviously the second inventor and not entitled to a patent," and contend that the decision of the Court of Customs and Patent Appeals [5] is res adjudicata of the issues here involved. They rely heavily upon Blackford v. Wilder, 28 App.D.C. 535, and Horine v. Wende, 29 App.D.C. 415. These and other cases cited [6] are not determinative of the precise question here involved.

Administrative decisions under 4911, Revised Statutes by the Court of Appeals of the District of Columbia prior to 1929 and of the Court of Customs and Patent Appeals subsequent thereto, limited as they are to the record before the Patent Office, are binding only on the Commissioner of Patents, but are not binding as precedents in the regular Federal constitutional courts.[7]

The doctrine of res adjudicata announced in the Blackford and Horine cases, supra, moreover has no application to concurrent, copending or companion interferences. Under such circumstances, despite prior decisions on some of such interferences, suits under 4915, Revised Statutes have been considered on the merits.[8]

It is also pertinent to note that the Court of Customs and Patent Appeals, recognizing the difference between its jurisdiction as limited solely to a review of the Patent Office Record and the broader scope of a 4915 Revised Statute action, has refused to consider the effect of a prior decision under

---

[5] Etten v. Jantz, 142 F.2d 680, 31 C.C.A., Patents, 1177.

[6] Defendants' Counsel cite Chase v. Coe, 74 App.D.C. 152, 122 F.2d 198; United States Rubber Co. v. Coe, 79 U.S.App.D.C. 305, 146 F.2d 315; McBride v. Coe, D.C.D.C., 50 F.Supp. 286. These cases do not involve concurrent or copending interferences but have reference to an attempt by a party defeated in one interference to have a new interference set up with substantially the same issue.

[7] United Shoe Machinery Corp. v. Muther, 1 Cir., 288 F. 283, 285. (The court here considered an issue of priority which had previously been decided by the Court of Appeals of District of Columbia under a 4911 appeal.) Inter-

national Cellucotton Products Co. v. Coe, 66 App.D.C. 248, 85 F.2d 869; Novelty Glass Mfg. Co. v. Brookfield, 3 Cir., 170 F. 946, 955; Dwight & Lloyd Sintering Co., Inc., v. Greenawalt, 2 Cir., 27 F.2d 823, 827; Tillman & Bendel v. California Packing Corp., 9 Cir., 63 F.2d 498, 503, certiorari denied 290 U.S. 638, 54 S.Ct. 55, 78 L.Ed. 554; John Morrell & Co. v. Doyle, 7 Cir., 97 F.2d 232, 235, certiorari denied 305 U.S. 643, 59 S.Ct. 146, 83 L.Ed. 415.

[8] Philadelphia Storage Battery Co. v. Zenith Radio Corp., 7 Cir., 117 F.2d 642; Hazeltine Corp. v. Radio Corp. of America, 67 App.D.C. 373, 92 F.2d 524; Raytheon Mfg. Co. v. General Electric Co., D.C.N.D.N.Y., 34 F.Supp. 40.

a 4915 Revised Statute action in a related interference.[9]

The Interferences Nos. 75,433 and 76,987 were declared on February 15, 1938, and April 25, 1939, respectively, whereas the Interferences Nos. 77,671 and 77,672 upon which the decision of the Court of Customs and Patent Appeals was predicated were not declared until November 8, 1939. It was not by reason of any action or choice of the plaintiff but because of the amendment to the Patent Laws, effective October 5, 1939, that the two later interferences traveled a separate and distinct path and were first decided. The interferences declared after October 5, 1939, were decided by the Board of Interference Examiners on the same date that the earlier interferences here involved were decided by the Examiner of Interferences.[10] These interferences (administratively separated by the Patent Office in accordance with the statute amended as aforesaid) therefore could not have been consolidated in one appeal. Interferences Nos. 75,433 and 76,987 were not ready for appeal on Bill in Equity at the time such action had to be taken on Nos. 77,671 and 77,672. Certainly it was not the intention of Congress, in changing the Patent Law, to penalize plaintiff as to the earlier interferences or to bar him from his remedies thereunder, especially since plaintiff was patentee under Interference No. 77,672 and as to such interference had no choice, his only remedy being appeal to the Court of Customs and Patent Appeals.[11]

In only two of the interferences, Nos. 77,671 and 75,433, are the same patent applications involved.[12] The Board of Appeals recognizing that the interferences were separate and distinct,[13] decided the issue of priority on the merits as to the two interferences now before us, although appeals to the Court of Customs and Patent Appeals were then pending on Interferences Nos. 77,671 and 77,672. There is also a public interest involved in the present case.[14] If plaintiff is estopped it will result in defendant's retention until September 3, 1963, ten years greater than plaintiff's of a monopoly grant which plaintiff alleges was improperly and fraudulently obtained.[15] It follows therefore that defendants' motion to dismiss the 4915 action must be denied. The important question is the extent to which new evidence may be considered and the effect to be given thereto.

[9] Meuer v. Schellenger, 104 F.2d 949, 953, 26 C.C.P.A., Patents, 1430.

[10] Section 4915, R.S., governing bills in equity to review decisions of the Patent Office, was amended concurrently with Section 4911, R.S. Prior to the amendment a condition precedent to such bill was a decision of the Board of Appeals whereas after the amendment the decision of the Board of Interference Examiners was sufficient. Lacking the requisite Board of Appeals decisions in Interferences Nos. 75,433 and 76,987 on April 23, 1942, plaintiff could not then bring bill in equity as to them even though he was forced to take action in Interferences Nos. 77,671 and 77,672, the time limit for taking appeals to the Court of Customs and Patent Appeals being 40 days. Rules of Practice, Patent Office, rule 149, 35 U.S.C.A. Appendix.

[11] Preston v. White, 92 F.2d 813, 25 C.C.P.A., Patents, 701; Wettlaufer v. Robins, 2 Cir., 92 F.2d 573, certiorari denied 302 U.S. 766, 58 S.Ct. 477, 82 L.Ed. 594; Wallace & Tiernan Products, Inc., v. Pittsburgh Plate Glass Co., D.C. W.D.Pa., 57 F.Supp. 639.

[12] Interferences Nos. 77,671 and 75,433 involved matters contained in Jantz application Serial No. 749,977 and Etten application Serial No. 38,932.

[13] In accord with the general rule stated in Re Einstein, 18 C.C.P.A., Patents, 885, 46 F.2d 373.

[14] Defendant contends, "A party may not take advantage of estoppel effective against his opponent to take something from the public. In the present case the refusal of a patent to Etten will not affect the public interest and there is accordingly nothing in the Sinko, [Sinko Tool & Mfg. Co. v. Automatic Devices Corp.] 2 Cir., 136 F.2d 186, case which precludes the use of the defense of estoppel." (Brief for Defendants, Page 34).

[15] Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376; Sinko Tool & Mfg. Co. v. Automatic Devices Corp., 2 Cir., 136 F.2d 186, and see also the comment of the Supreme Court in Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250, and Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 815, 65 S.Ct. 993, 89 L.Ed. 1381.

It is well settled that a bill in equity under 4915 is "an original independent action in which the questions in issue are tried de novo upon all competent evidence new and old." [16]

We are not here concerned with the doctrine that where a party intentionally withholds evidence in his possession prior to and during the interference proceedings such evidence will not be considered in the equity proceedings.[17] The distinction has been pointed out in Minnesota Mining & Mfg. Co. v. Carborundum Co., 3 Cir., 155 F.2d 746, 748.[18] There is nothing before us to indicate that any evidence was intentionally withheld by plaintiff. There is, however, every reason to believe that some of the evidence now adduced, including documents which were in its possession, was intentionally withheld by Lovell. It is true that plaintiff suspected some of it and even so indicated to the Patent Court, but it was not until the newly discovered evidence was added that the plaintiff's interpretation thereof assumed meaning and spurred the search for additional documents and oral testimony.[19] The oral testimony upon which defendants previously had prevailed becomes in effect a nullity in the light of the composite picture created by the new evidence. It is contended that the administrative decision supported by substantial evidence is conclusive under the doctrine of Morgan v. Daniels, 153 U.S. 120, 14 S.Ct. 772, 38 L. Ed. 657. The force and effect to be given such decision has been discussed in numerous cases.[20] The rule is stated in Minnesota Mining & Mfg. Co. v. Carborundum Co., 3 Cir., 155 F.2d 746, 748, 749, as follows: "Morgan v. Daniels states a rule of law whereby a fact question must be judged. The question therefore is whether all competent evidence, 'new' and 'old', offered to the District Court carries 'thorough conviction' that the Patent Office erred. General Talking Pictures Corp. v. American Tri-Ergon Corp., supra, at page 812 of 96 F.2d. A proceeding under R. S. Section 4915 is an anomaly. The trial in a District Court is a trial de novo. But the decision of the Patent Office may not be reversed unless the evidence before the court carries thorough conviction that the Patent Office erred. In other words, a District Court may not reverse the decision of the Patent Office on a mere preponderance of the evidence. More is required. The District Court must find that the decision of the Patent Office was without substantial basis in the evidence or was wrong as a matter of law." [21]

In addition to the 4915 action, the granting of the Jantz Patent No. 2,406,951 during the pendency of this action raised the clear issue of priority between interfering patentees since the prior granted Etten Pat-

---

[16] General Talking Pictures Corp. v. American Tri-Ergon Corp., 3 Cir., 96 F.2d 800, 812; Hoover Co. v. Coe, 325 U.S. 79, 83, 65 S.Ct. 955, 89 L.Ed. 1488; Minnesota Mining & Mfg. Co. v. Carborundum Co., 3 Cir., 155 F.2d 746; Daniels v. Permutit Co., D.C.Del., 44 F. Supp. 74, reversed on other grounds, 3 Cir., 137 F.2d 823.

[17] Barrett Co. v. Koppers Co., 3 Cir., 22 F.2d 395; Schilling v. Schwitzer-Cummins Co., 79 U.S.App.D.C. 20, 142 F.2d 82.

[18] See also Globe-Union, Inc., v. Chicago Telephone Supply Co.; 7 Cir., 103 F.2d 722, 728.

[19] Cf. Globe-Union, Inc., v. Chicago Telephone Supply Co., supra, for a situation very similar to the present case.

[20] Most pertinent here is the comment of the court in discussing Morgan v. Daniels, supra, and Barrett Co. v. Koppers Co., supra, in Globe-Union, Inc., v. Chicago Telephone Supply Co., supra, 103 F.2d at page 727, as follows: "The additional evidence found in the trial court's record is not merely cumulative in nature. On the contrary, it carries with it thorough conviction, and strikes hard at the core of Schellenger's evidence." See also Appert v. Brownsville Plate Glass Co., C.C.W.D.Pa., 144 F. 115; Daniels v. Permutit Co., supra.

[21] We adopt, in toto, Judge Goodrich's comment in Daniels v. Permutit Co., supra, 44 F.Supp. at page 79, in passing upon the precise question here posed: "The court has in mind the decision of Morgan v. Daniels, 1894, 153 U.S. 120, 14 S.Ct. 772, 38 L.Ed. 657, and there is no disposition to minimize the importance of the considered judgment of the experts responsible for the administration of the Patent Office. But Morgan v. Daniels clearly has no application to the conclusion reached here because the new testimony is overwhelmingly in support thereof and was not before the officials in the Patent Office who made the award from which this appeal is taken.".

ent No. 2,054,970 and the Jantz patent are coextensive in their scope. Claim No. 34 of the Jantz patent, except for a slight change in phraseology is identical with Claim No. 13 of the Etten patent. If this Claim No. 34 of the Jantz patent is void, then there is no occasion for a disclaimer of Claim No. 13 of the Etten patent and such claim is properly before the Patent Office in the reissue application. We comment on this since Counsel for defendants have devoted considerable argument to this point under their theory of estoppel. Such argument is predicated upon the theory that Claim No. 13 was involved in Interference No. 77,-672. The Court of Customs and Patent Appeals merely authorized the Commissioner of Patents to issue a patent to Jantz because on the evidence as it stood in the record of the Patent Office it found Jantz to be the first inventor. Revised Statute 4918, 35 U.S.C.A. § 66 provides: "Whenever there are interfering patents, any person interested in any one of them, * * * may have relief against the interfering patentee, * * * by suit in equity against the owners of the interfering patent; * * *." The statute further provides that the court "may adjudge and declare either or both of the patents void in whole or in part."

▉ The plaintiff, when the Jantz Patent issued, certainly became entitled to a bill in equity under 4918 with the incidental right to a trial de novo on the primary issue of priority and was entitled by his amendment to include this additional cause of action. As was stated by the Supreme Court in Triplett v. Lowell, 297 U.S. 638, 644, 56 S.Ct. 645, 648, 80 L.Ed. 949, "* * * want of disclaimer of claims previously held invalid can never be set up as a bar in limine to the maintenance of a second suit upon those claims, and any others of the patent, since the patentee is entitled to invoke in that suit the independent judgment of the court upon the validity of the claims which have been held invalid."

Etten's claim to priority as to Claim No. 13 as against Jantz's Claim No. 34 is the very issue involved in this action. It is difficult to see how Etten could be required to first disclaim that which he is seeking to es-

tablish and vindicate in this action. Especially is this true where, as in the instant case, plaintiff contends that such subsequent patent was fraudulently obtained. As was stated in Lorenz v. Colgate-Palmolive-Peet Co., 3 Cir., 122 F.2d 875, 880: "The right of a court under R.S., Sec. 4918, to declare either or both of two interfering patents invalid 'upon any ground' seems to us to dispose adversely of the plaintiff's contention that the defendant is estopped from denying the validity of the Lorenz patent because of matter incident to or growing out of the interference proceeding in the Patent Office, * * *. Any possible estoppel of parties would be without relation to the court's power to declare a patent invalid upon sufficient showing or its duty to exercise such power in an appropriate case."

▉ In addition to the matters hereinabove referred to, plaintiff also included in his complaint an action for damages predicated upon conspiracy. In a previous ruling in this case, Judge Schoonmaker held that under Rule 18 of the Federal Rules of Civil Procedure plaintiff in his complaint could join an action for damages for conspiracy to produce false and fraudulent evidence before the Patent Office and a bill in equity under Section 4915. This ruling constitutes the law of the case.[22]

### Discussion of Facts

No difficulty would be experienced in arriving at the facts in this case were it not for the opinion of the Court of Customs and Patent Appeals, Etten v. Jantz, 142 F. 2d 680, 31 C.C.P.A., Patents, 1177 involving Interferences Nos. 77,671 and 77,672, upon which opinion great stress has been placed by defendant.

In the proceedings before the Examiner of Interferences and the Board of Interference Examiners both parties took testimony by deposition only, which by stipulation was made applicable to all four interferences. As we have already indicated, this is a trial de novo, and the question therefore is whether all competent evidence, "new" and "old" offered herein carries "thorough conviction" that the Patent Of-

fice erred. We are of the opinion that this question must be answered in the affirmative in the following particulars.

The opinion of the Court of Customs and Patent Appeals was predicated primarily on the depositions of Gustave H. Jantz, Bernard A. Brueggeman, Joseph Dasbach, Herman Onck, Mrs. Herman Onck, and the authenticity of Jantz Exhibit "O."

The court in Etten v. Jantz, supra [142 F.2d 683], conceded that where the usual records are absent the oral testimony [23] must be scrutinized, but concluded that it found "nothing in the record impugning the credibility of said corroborating witnesses." This testimony was dependent upon the authenticity of and time element involved as to the alleged first completed wringer (Jantz Exhibit "O", Patent Office) as to which considerable emphasis was placed on a change from keyhole slots to round holes, pursuant to an infringement notice, which was stressed as fixing a date prior to which this Exhibit "O" had been completed. That court did not have before it facts now revealed which present an entirely different picture. As to the physical Exhibit "O," the testimony of Jantz in the deposition taken in October 1940, under the questioning by Attorney Lord, would give the impression that at the time the question of evidence for the Patent Office first arose this wringer was produced immediately by Jantz.[24] It now appears, from the defendant's own records, known to Attorneys Lord and Herbsleb at the time but not revealed,[25] that at the time of Jantz's first preliminary statement of March 16, 1938,[26] Jantz had not mentioned or produced this wringer.

On the contrary, Brueggeman, one of the corroborating witnesses, sometime prior to April 30, 1938, had turned over to Mr. Jantz what was then thought to be the "first Jantz Toggle Wringer" that was made. This was the statement of Herbsleb to Lord in a letter of April 30, 1938.[27] It was later discovered that this wringer was made of

---

[23] All testimony was by deposition.

[24] Plaintiff's Exhibit No. 155, Pages 21, 22, Questions and Answers 95, 96:

"Q95. How did you come to have this exhibit,—will you tell us where it came from, and how you came to get it for this case? A. All of it, or what?

"Q96. Where was it after it was made,—where was it put? A. After it was made it was kept awhile, and then I took it out and showed it and then brought it back to the factory, and when it was decided that the Corcoran Company would quit business and sell out, I gathered up a certain number of wringers of different makes and ours, this included, because I wanted it as a sort of, you might say, keepsake, and I put all of those things in one corner of the factory floor, and put a card on it,—property of G. H. Jantz. And then, later on, as things were being moved out of the factory by the people that had bought those articles, I had a truck take all of these old wringers and stuff, all I had put in the corner, and sent it down to the Boss Washing Machine Company, who very kindly allowed me to put it in a corner down there in one of their factory rooms, and when this matter came up, and I wanted something, I went down there to the Boss Washing Machine Company and picked up some things, and among them I picked up this wringer."

[25] Nor was it revealed at that time that Attorney Lord was actually acting on behalf of Lovell, the then assignee thereof, which assignment was not however placed on record, nor that Herbsleb was being paid by Lovell. Throughout there was a careful plan manifest to give the impression that it was solely a battle by the elderly Jantz.

[26] Plaintiff's Exhibit No. 166. In this preliminary statement Jantz fixed April 10, 1933, as the date when the machine was first successfully operated. Lovell, through Lord and Herbsleb, had succeeded in substituting an amended statement with the earlier date of completion. It was not at that time revealed that several other statements had been prepared for and by Jantz fixing intermediate stepped-up dates. This first statement was finally produced by Counsel for defendants in the present proceedings, but most reluctantly on the last day of the hearings.

[27] Plaintiff's Exhibit No. 27a.

"Mr. Brueggeman also turned over to Mr. Jantz the first Jantz Toggle Wringer that was made, and I have had some photographs made of it.

\* \* \* \* \* \*

"Mr. Brueggeman states that this first wringer was begun on or about the 1st of June, 1932, and completed and successfully operated on or about the 1st of December, 1932. He said this first wringer was used at that time in actually wringing clothes, and that it operated successfully."

production parts [28] for which the dies were not in existence until sometime after September 21, 1933.[28½] Although, according to Herbsleb, Jantz and Brueggeman both told him it was the first wringer and he himself ascertained that it could not be sustained as such,[29] nevertheless, in spite of such developments, Herbsleb now contends that Jantz finally in December 1939, produced Exhibit "O", and that he asked Jantz for no explanation.[30] It is significant that this occurred after a meeting between Lord, Herbsleb, Kauffman, Jantz, and Brueggeman.[31] Under such circumstances, Jantz in his deposition, made in accord with a memorandum previously prepared for him,[32] testified as though it was his personal knowledge as to matters concerning which he had never had any doubt and as to which he had never had any occasion to change his story. The evidence now adduced presents an entirely different picture. In their brief for Jantz [33] before the Board of Appeals, Lord and Herbsleb [34] stressed the authenticity of Exhibit "O," and the evidence to the effect that Exhibit "O" was the first wringer; that immediately thereafter a second wringer was made, while parts of Exhibit "O" were being plated; that they were made with keyhole slots, and that a Notice of Interference as to keyhole slots given to Corcoran Mfg. Company by Lovell on June 17, 1932,[35] was intended to establish that such wringers were made prior thereto; [36] and that the base with keyhole slots was removed and a base with round holes introduced but that the uprights were in the original wringer.[37] Using the original infringement notice as to the keyhole slots as a basis for giving credibility to the testimony of the witnesses as to dates prior to June 1932, Lord and Herbsleb, although they elicited such testimony from the witnesses,[38] never referred to or revealed the correspondence between themselves,[39] which followed this infringement notice, and which now shows that no final determination was reached and the arrangements for such a change not made until after the receiver was appointed [40] and until some unknown time after Herbsleb's letter of October 10, 1932.[41] Climaxing all this is the conclusive proof now before this Court that the entire frame of Exhibit "O" was not in existence until after such change had been made as to the preceding wringer models, and that the bottom bar on such frame never had been changed from a keyhole slot to a round hole. Such bottom bar never was removed and such frame must

---

[28] Herbsleb now admits that the first time he saw or had any knowledge of Exhibit "O" was in December 1939 (Plaintiff's Exhibit No. 135—Testimony of Herbsleb—Question 204 et seq.), although prior to December 1939, he spent considerable time with Jantz, Brueggeman, and others (Plaintiff's Exhibit No. 135—Testimony of Herbsleb—Question 208, and his various reports to Lord).

[28½] Plaintiff's Exhibits Nos. 54 and 55 (A—I) (Order and quotations for Dies).

[29] Plaintiff's Exhibit No. 135—Herbsleb's testimony, Questions 225, 226, 227.

[30] Plaintiff's Exhibit No. 135—Herbsleb's testimony, Question 218.

[31] Plaintiff's Exhibit No. 135—Herbsleb's testimony, Questions 276–281 and cf. as to time element and activities thereafter. Herbsleb's letter and memo of December 16, 1939 (Contained in Plaintiff's Exhibit No. 27b).

[32] See Herbsleb's letter of October 17, 1940, and accompanying memo (Plaintiff's Exhibit No. 27c).

[33] Brief for Gustave H. Jantz in the United States Patent Office, before the Board of Appeals, Pages 22—32.

[34] Actually at that time representing the present defendant Lovell, the unrevealed assignee (e. g. See Herbsleb's letter to Lord, dated November 5, 1940—Plaintiff's Exhibit No. 92).

[35] Jantz Patent Office Exhibit "K".

[36] Brief for Gustave H. Jantz in the United States Patent Office, before the Board of Appeals, Page 30.

[37] Brief for Gustave H. Jantz in the United States Patent Office, before the Board of Appeals, Page 28.

[38] The correspondence indicates that Lord originated the idea of using the June 1932, letter at one of the conferences with witnesses (e. g. Letters of December 7, 9, and 19, 1939, Plaintiff's Exhibit No. 27b).

[39] e. g. Plaintiff's Exhibits Nos. 56, 57, 58, 95, and 96.

[40] Receiver was appointed September 1932. Lord wrote to the Receiver on October 3, 1932 (Plaintiff's Exhibit No. 96).

[41] Plaintiff's Exhibit No. 95, and see also Plaintiff's Exhibit No. 135—Herbsleb's testimony, Questions 165 to 182 inclusive, and the exhibits referred to therein.

have been made after the change in production to a frame with round holes in the base.[42]

The other method used by the witnesses in the depositions in the Patent Office proceeding to tie in Exhibit "O" with the other occurrences was the contention that Exhibit "O" had certain parts plated and such plating was done by one Al Yaegers, while the second or duplicate wringer was being made immediately after Exhibit "O" had been completed.[43] Evidence now adduced proves convincingly that this actually occurred in April 1933,[44] and affirms the irresistible conclusion that Exhibit "O" was not completed and in existence until that year. This conclusion is also in accord with the uninfluenced sworn first preliminary statement of Jantz [45] that the wringer was completed and first successfully operated about April 10, 1933. It is also in accord with a letter Jantz wrote on February 19, 1938, to the Lovell Mfg. Co.,[46] and again on February 22, 1938, to Lord,[47] and reaffirmed in a letter to Lord on March 3, 1938.[48]

[42] Transcript of Proceedings at Erie, Pennsylvania, October 21-23, 1946. Testimony (Page 141 et seq.) of C. Weston Steward, an expert on welding, that such wringer frame was never rebuilt or changed.

[43] Plaintiff's Exhibit No. 155, Pages 97 and 102, Dasbach in his deposition testified:

"Q196. The one that you kept, was that the first one you made, which is the one that was plated, was that the first or some of the others? A. The one that was plated, it was the first.

"Q197. How did you come to make the second one after this first one, do you remember anything about that? A. Well, the plater that worked for Corcoran, he was located downtown,—they took, after I had the parts all tried out,—we took those parts they had to be plated, to the plater, and while they was at the platers' I started to work on the parts for the second one. By the time they come back for assembling, I had them pretty near ready, and I could compare them with the parts that was made first; at the same time we kept the frame and I tried those parts I made out in the frame.

* * * * * *

"XQ247. You said when you made this original Jantz Exhibit O, that the original parts which you identify as now present on Jantz Exhibit O, were taken to the plater to be plated, as they now appear? A. Yes.

* * * * * *

"XQ253. Well, these particular parts were plated at some particular time, were they not? A. Well, they was plated in 1932."

Cf. Brief for Gustave H. Jantz submitted by Lord and Herbsleb before the Board of Patent Appeals, United States Patent Office (Pages 25, 26).

[44] Transcript of Proceedings at Erie, Pennsylvania, October 21-23, 1946. Testimony of Aloysius H. Yaegers, Page 104 et seq.

[45] Plaintiff's Exhibit No. 166—Jantz's first preliminary statement which was sent by Herbsleb (in letter of March 16, 1938, in Plaintiff's Exhibit No. 27a) to Lord, not known to the Patent Office and reluctantly produced on the last day of the present trial.

[46] Plaintiff's Exhibit No. 10. In this letter to Lovell Mfg. Co. Jantz stated:

"Not long after the first sample wringer equipped with the toggel-lever device was finished I showed it to Nineteen Hundred Corp. who gave me an order June 20, 1933. As the dies for production had not been made, nor even started on, because I wanted to find out first whether or not the Trade would buy this wringer, immediate shipment could not be made."

[47] Plaintiff's Exhibit No. 12. In Jantz's letter to Lord he stated:

"The sample Toggel-lever wringer which I showed June 20, 1933 I think, was talked about, off and on, during it's construction about thirty days previous to June 20, * * *."

[48] Plaintiff's Exhibit No. 17. Jantz wrote:

"The two release bars came as a suggestion from a wringer which was so constructed, and which I had obtained from a W.M.M. and brought to the factory, for the purpose of figuring to make it.

* * * * * *

"The four different models which were being manufactured were made according to my directions and approval, so the toggel-lever lock was constructed more or less according to my directions, and when I approved it a sample wringer was finished, which I took on a trip to show and find out what the W.M.M. would say about it, so as to decide whether or not we would be justified to go into production of the wringer.

"I believe the first W.M.M., at least one of the first, I showed this wringer to was the Nineteen Hundred Corp. June 20, 1933 according to their order, therefore I judge that it must have been about

Kauffman, on behalf of Lovell Mfg. Co., then interviewed Jantz. Kauffman's report to Lord on April 15, 1938, is illuminating.[49] In spite of the fact that Kauffman himself took a production wringer and in a few weeks developed a toggle release for it shortly after Jantz had visited him in June 1933,[50] and in spite of the fact that Jantz "* * * steadfastly maintained that it was only a matter of a couple of months from the first conception of the invention until they had a sample and took orders from Nineteen Hundred",[51] and in the face of the fact that Jantz insisted he had obtained the idea from the Voss Wringer,[52] Kauffman exerted extreme pressure on the aged Jantz[53] attempting to convince him that it must have taken from a year to a year and a half.[54] Kauffman also knew that Jantz was in straightened financial circumstances and hopeful of getting employment with Lovell Manufacturing Company[55] to whom he had assigned his patent application, with a balance of $1500 dependent upon a successful outcome of such proceedings.[56] The effort was to get Jantz to make a preliminary statement giving a date antedating the Etten date.[57]

a month previous to this date when the toggel-lever device was first mentioned, of course I thoroughly tested the wringer before I took it on the trip."

[49] Plaintiff's Exhibit No. 14.

[50] Plaintiff's Exhibit No. 134, Page 68.

[51] Plaintiff's Exhibit No. 14—Kauffman's report to Lovell Mfg. Co. of interview with Jantz.

[52] Plaintiff's Exhibit No. 14—Kauffman's report to Lovell Manufacturing Company of interview with Jantz.

"One other thing that was discussed at some length was that Jantz had frequent contacts with Walter Voss at the Voss plant about the inverted U type release bar. Jantz said that he got this proposition of having one of those bars on either side of the wringer from Voss, and had gone ahead and made up a model using this mechanism on the Corcoran wringer * * *. He stated that one of the reasons why he didn't think it took them long to work up the toggle job was that he already had the release bar part of it done due to his work on the Voss-Chamberlain wringer and that he therefore had only to invent a new release mechanism, that is, the toggle, in order to complete it."

[53] Although Jantz was actually 82 years of age (Plaintiff's Exhibit No. 51) Jantz in his deposition, under the questioning of Lord, gave his age as 65. (Plaintiff's Exhibit No. 156, Jantz Deposition, Question 1.)

[54] Plaintiff's Exhibit No. 14—Kauffman's report of April 15, 1938, covering the meeting on Good Friday states:

"I argued with him that on the face of it this didn't look right to us because our experience was that it took from a year to a year and a half, rather than just two or three months, to get this much accomplished. Jantz wouldn't budge an inch for a couple of hours under more or less a third degree from me. I understand this was the position he took when he was in Erie and he seemed

to have his mind stubbornly shut on the subject."

[55] Plaintiff's Exhibit No. 14—Kauffman's report.

"He seems very kindly disposed toward the Lovell Company in every way although quite downcast that we weren't taking him back to work and professed to be still hopeful that Mr. A. M. Doll would some day give him another opening. I evaded this question entirely."

Also in the report "I gathered from all appearances that Jantz is in pretty straightened financial circumstances, terribly distressed and worried and pretty wobbly in every way."

[56] Plaintiff's Exhibit No. 26. This assignment was not revealed during the Patent Office proceeding. The depositions gave the impression that it was an unaided effort by the elderly Jantz himself.

[57] Kauffman, Chief Engineer of the Lovell Manufacturing Company, at that time knew the Etten *filing date* of December 23, 1932, and was striving to get Jantz, by intermediate stages, to step up the dates. In his report (Plaintiff's Exhibit No. 14) Kauffman stated: "I took him over to the Church to the noonday services to try and break up the deadlock in his thinking. It did some good for after Church, and resting his mind a bit he decided that it might have been as early as January, 1933 when he first thought of the toggle device. This did not seem like much gain, but it was so hard fought that I didn't want to lose it, so I called up Herschlerb and took Jantz up there to make up new preliminary statements."

(Note) This second known preliminary sworn statement also was suppressed and was never used, but is again mentioned in Herbsleb's letter to Lord of April 23, 1938 (In Plaintiff's Exhibit No. 27a) and the same dates repeated in his letter of April 30, 1938 (In Plaintiff's Exhibit No. 27a) in which letter he also states: "Mr. Brueggeman states that this first wring-

What occurred between April 30, 1938, and May 3, 1938, leaves much to the imagination, but it is clear that on May 3, 1938, Jantz again executed a sworn preliminary statement in which the date of conception was stepped up to April 1, 1932, and date of completion to September 1, 1932.[58] This is the preliminary statement which was filed to meet the time limit of May 6, 1938, and subsequently, before opening thereof in the Patent Office, replaced by the sworn final preliminary statement of January 2, 1940.[59] As to the methods used to obtain the substitution of this statement, it is pertinent to note that Herbsleb made an affidavit[60] in which he states that Jantz did the investigating and reported to him,[61] and that the statement of Jantz as to the destruction of the records of the Corcoran Company as to such wringers was to the best of his knowledge true.[62] Against this affidavit appears the correspondence between Herbsleb and Lord and Herbsleb's memoranda made during the intervening period which shows conclusively that Herbsleb directed the investigation and did a great deal of the interviewing himself; knew that Brueggeman had turned over to him some pertinent office records (which will be touched upon later) and records as to the Modern Tool Co. in connection with the dies for production of the wringer, in fact, had sent them personally to Lord who kept them, unrevealed, in his files, and knew that such records, although pertinent, had not been shown to the witnesses whose recollection might have been aided thereby. As to the Examiner's statement in allowing the substitution that "Jantz did not at the time of his motion know what dates Etten was urging and therefore the motion should not be summarily denied," Herbsleb and Lord in their brief before the Board of Appeals stated: "Further, there is no suggestion that Jantz's counsel (Herbsleb) at the date the original statement was made had any knowledge of this prior testimony, and *nothing to indicate the communication of any* knowledge that the *later associate* attorney might have to Jantz." (Emphasis supplied)   This has an ironic ring in view of the fact that the Lovell Manufacturing Company was the unrevealed real party in interest; that Lord was their Attorney; that Herbsleb was actually employed by Lord throughout, was being paid by the Lovell Manufacturing Company; and that their correspondence shows they were making every effort to ascertain Etten's dates and that as their knowledge thereof increased, their efforts to step-up Jantz's dates increased,[63] and in doing so avoided the use of records which they knew might have an adverse effect. This is true as to further proof of Exhibit "O's" 1933 origin given by Louis M. Ellebrecht, who was Purchasing Agent and somewhat of a General Supervisor at the Corcoran Manufacturing Company. Herbsleb contacted Ellebrecht[64] prior to the taking of the Patent Office

---

er was begun on or about the 1st of June, 1932, and completed and successfully operated on or about the 1st of December, 1932. He said this first wringer was used at that time in actually wringing clothes, and that it operated successfully." This is the wringer which was made from parts produced from dies which were not in existence until sometime after September 21, 1933 (Plaintiff's Exhibit No. 54).

[58] Herbsleb's letter to Lord, dated May 3, 1938 (In Plaintiff's Exhibit No. 27a and Plaintiff's Exhibit No. 145).

[59] Plaintiff's Exhibit No. 146.

[60] Part of the Renewal Of Motion For Leave To File Substitute Preliminary Statement, Plaintiff's Exhibit No. 150.

[61] E. g. (Plaintiff's Exhibit No. 150) "Affiant thereupon requested the party Jantz to diligently re-investigate * * *, and that as the result of such re-investigation, the party Jantz supplied affiant with the dates and information contained in the substitute preliminary statement * * *."

[62] Plaintiff's Exhibit No. 150 (Affidavit of Herbsleb contained therein).

[63] E. g. Lord's letter to Herbsleb, dated September 13, 1938, (In Plaintiff's Exhibit No. 27a); Lord's letter to Herbsleb, dated January 2, 1940 (In Plaintiff's Exhibit No. 27c); Herbsleb's letter to Lord, dated February 29, 1940 (In Plaintiff's Exhibit 27c); Kauffman's Testimony (Plaintiff's Exhibit No. 134, Page 44, et seq.). Kauffman and Lord were in the Etten v. Kauffman trial on October 5, 1939.

[64] Ellebrecht's testimony (testimony at Erie Trial, October 21-23, 1946, at Page 79) as to this is confirmed by Herbsleb's own notes (e. g. Memo of May 29, 1940, Plaintiff's Exhibit No. 27c, in which appears "He said that * * * he had no means of fixing the dates, * * *").

depositions, and although he had in his possession the two Corcoran Company records which Brueggeman had turned over to him and which clearly showed Ellebrecht as a participant in certain phases of the Model "T" wringer development,[65] did not show them to Ellebrecht.[66] If further proof were needed that the Model "T" wringer was not developed until 1933, it is convincingly supplied by Ellebrecht's testimony,[67] which dovetails with Jantz's original "unassisted" recollection and with the now available additional facts and records.

It is also confirmed by the testimony of Mrs. Blanche Schneider Patzhold.[68] Further confirmation of the completion of the wringer in 1933 is found in the testimony of Anthony Busam, a tool die maker, who took care of large dies and general machinery repair at Corcoran Manufacturing Company. He was interviewed by Herbsleb in 1940,[69] but not shown the Corcoran records nor the wringer,[70] and was not called as a witness.[71]

A further recital of additional details now revealing the true picture would serve

---

[65] Plaintiff's Exhibit No. 53. Inter-office Memorandum from Ellebrecht to Brueggeman dated June 13, 1933, which stated:

"If it is possible, I would like to have prints on the new parts for the Model 'T' Wringer sample of which Mr. Jantz took out yesterday.

"All these parts should be lined up and be all set to go if Mr. Jantz does secure any orders for this type of wringer."

Plaintiff's Exhibit No. 52. Memorandum to Brueggeman and Ellebrecht, dated November 17, 1933, which stated, inter alia: "Now that we have the Model T Wringer completed, the first thing we ought to do is to get up a complete Parts List of all parts."

[66] Transcript of Proceedings at Erie, Pennsylvania, October 21-23, 1946, Ellebrecht's testimony, Pages 79 and 80, in which he further states: "If he had showed me those memorandums at that time, I probably could have given him some more definite information; * * * he asked for dates at that time * * *."

[67] Transcript of Proceedings at Erie, Pennsylvania, October 21-23, 1946. Ellebrecht testified that they continued experimenting until they developed the Toggle release (Page 72); that they were working under receivership (which was after September 1932) and desperately needed something different (Page 73); that he placed the order in September 1933, with Modern Tool Co. for the dies for production (Page 74); that the Model "T" wringer was actually completed about June 1933, (Page 74) when the wringer was set up on a washing machine and tested (Page 74) and that "We put it on the machine and it seemed to work satisfactorily, and it was so different, and Mr. Jantz was so anxious to get out with it that—well, it was just a rush job getting it completed and painted and certain parts plated and everything ready so Mr. Jantz could rush out with this model in order to get the busi-

ness. You see, he was just as anxious to get this business as we were, because while we were in receivership and financial difficulties, he was— * * * in financial difficulties himself, * * *." (Pages 74, 75); that Al Yaeger did the plating (Pages 75 and 80); that they pushed Al Yaeger to get the plating done " * * * because we were that anxious to get Mr. Jantz on the road with that sample." (Page 80); that there were no unnecessary delays, the breaking down of the "big press" at that time being considered quite a blow (Page 89) and confirmed Yaegers' Testimony as to starting in business at the end of 1932 (Page 90); and that there was no question about getting money to start production (Page 94); and the further fact that the Corcoran inventory which he took at the time of the receivership did not include a wringer corresponding with Exhibit "O".

[68] Plaintiff's Exhibit No. 137. Testimony of Mrs. Blanche Schneider Patzhold (employed at Corcoran as receptionist, typist, etc.) that the Model "T" was completed in 1933 (Page 59), definitely after the receivership commenced (Pages 57, 59, and 63). She was called to a conference in 1940 at which Herbsleb, Jantz, Brueggeman and others from "the factory" were present, but she was not called as a witness in the Patent Office proceedings (Page 61).

[69] Plaintiff's Exhibit No. 137. Testimony of Anthony Busam (Page 25).

[70] Plaintiff's Exhibit No. 137. Testimony of Anthony Busam (Pages 28, 30, and 31).

[71] Plaintiff's Exhibit No. 137. Testimony of Anthony Busam. Busam saw Dasbach working on the development of this wringer, the first time, in 1933 (Page 23). Busam was at the time repairing the "big fender draw press" referred to by Ellebrecht (Page 15); described Al Yaeger as the plater of the handle (Page 25) and that "They took it (the wringer) up and they Ducoed it and Jantz took it on the car and away he went" (Page 24).

no further purpose. It is now clearly apparent that Jantz knew and that the fact was that his Toggle Release Wringer (Exhibit "O") was not completed and reduced to practice until sometime in March or April 1933. The concealment of material records and knowledge on the part of Herbsleb, Lord and Kauffman; the use of records out of context, as in the use of the infringement notice of June 17, 1932, in the face of the remaining correspondence in their files giving an entirely different time element to that event, and the personal knowledge of Lord and Herbsleb concerning the same; the now quite evident pressure brought upon Jantz, an aged man of 82 rather than the age of 65 given in his deposition; the advantage taken of his straightened circumstances; the false picture given by the concealment of the true party in interest; the eliciting of statements in the depositions of witnesses which in the light of their own personal knowledge they must have known were not true, present a sordid picture.

A brief comment on the depositions of the corroborating witnesses in the Patent Office proceeding may be in order. Jantz in his deposition had stated that the frame was first made with the keyhole slot; that they made another lower section of this frame with round holes, and put in that section.[72] It is now known that Exhibit "O" was never so changed. It is now known that this wringer was not made until 1933. Brueggeman likewise knew that a change from keyhole to round hole in the general manufacturing of wringers had been made and also used it as fixing a date prior to which certain events occurred, but he was shown by Lord and Herbsleb only the letter of June 1932, not their subsequent correspondence, so that he would use that date to refresh his recollection as to the time of change. It now appears such change was not made until after the receivership. Furthermore, Lord and Herbsleb were Counsel at the taking of depositions and avoided any reference to the Corcoran records he had turned over to them. His testimony gave the impression that it was his original personal recollection. It gave no intimation that he had produced a wringer made of production parts and claimed it to be the original, or that he had changed and stepped up his dates from those he originally gave. He was asked about the Voss advertisement appearing in the June 1932 issue of the Electrical Merchandising Magazine, which was used as a focal point in fixing the stepped-up dates.[73] In the light of what is now known, an analysis of Jantz's deposition shows that his recollection of that advertisement was with reference to the three sided or U-shaped release for which Jantz already had a patent, and which appeared in the Voss picture. Brueggeman now admits he did not know whether the ad showed a toggle release, in fact, could not see the mechanism; that the event had reference to the three sided release bar on which Jantz already had a patent, which he had shown around the shop; that it had no bearing at all on this toggle lever release.[74]

In view of the general indication throughout the evidence that there was continuous experimentation, it is unbelievable that Jantz, with a patent issued in 1931, on a three sided release bar, had not tried it out on some of the earlier wringers. The advertisement incident no doubt occurred with some comment on Voss coming out with a three sided release bar but not as to the toggle release development, nor as to Exhibit "O." Brueggeman now denies a great many things he stated in the affidavit [75] signed by him in connection with the substituted preliminary statement,[76] and finally admits that he might be a year off on his date. He stated: "I'm afraid that's what the trouble might be." [77]

---

[72] Plaintiff's Exhibit No. 155. Jantz's Deposition (XQ. 285).

[73] Plaintiff's Exhibit No. 155. Brueggeman Deposition (Q. 126). This was also a material factor in his affidavit which accompanied the application to substitute the later preliminary statement.

[74] Plaintiff's Exhibit No. 137. Brueggeman's Testimony (Q. 429 et seq.).

[75] Plaintiff's Exhibit No. 150.

[76] Plaintiff's Exhibit No. 137. Brueggeman's Testimony (Q. 385 et seq.).

[77] Plaintiff's Exhibit No. 137. Brueggeman's Testimony (Q. 545).

Dasbach's deposition gave the impression that his testimony was his own recollection, uninfluenced and unrehearsed. He testified that he had first seen the drawings of the wringer development, had first talked to Herbsleb that morning, in fact that he had not talked with anybody about the case before that morning.[78] Herbsleb and Lord permitted him to so testify knowing (as their records now conclusively show) that Dasbach, as he now admits,[79] had been present at numerous conferences with Herbsleb, Lord, Jantz, and Kauffman. A built-up story was thus given the appearance of a fresh uninfluenced original recollection that would have great bearing on credibility. In his deposition he fixed the time by the fact that two accidents happened on the same day and that he was working on the wringer.[80] Yet he now reluctantly admits that he was working on a wringer at another time when two accidents occurred, in one of which he himself was injured, but he cannot state what model wringer.[81] He admits now that he could not state the model he was working on at the time of the accident mentioned in his deposition,[82] and to the question "You mean on this Exhibit O here, this one that is painted green?" answered "Oh, I couldn't tell. I was working on a handle. I didn't have the rest of it." The analysis could continue, but suffice it to say that Dasbach's deposition in the light of the cold facts now known clearly becomes worthless.

The depositions of Herman Onck and his wife and the date of April 10, 1932, fixed by the "Cat" date, were important factors in the Patent Office proceedings, and were tied in with the Exhibit "O" which was non existent on April 10, 1932. April 10, 1932, was a Sunday. Both Mr. and Mrs. Onck now admit they did not go to the factory on a Sunday.[83] They have given no satisfactory explanation. Virginia Morris, who made the "Cat" entries, confirms the entry as having been given to her by the Oncks and not a guess, as was the case in some other entries where a question mark or other notation appears.[84] Her testimony and the "Cat" record also shows that "Sudie" had other litters, one as late as September 1933. Mrs. Onck now admits she never did the washing, was not particularly interested in washing machines.[85] She thought Exhibit "O" was the wringer she saw because it had the bar on the front. She is not even sure now that the one she saw had a bar.[86]

In view of the fact that the three sided bar release was patented by Jantz in 1931, and that Jantz must have tried this out in some form or other during the course of experimentation, and in view of the fact that tests such as were made with Exhibit "O" were frequently made, as various changes were made on the wringers, it is quite possible that she did see a wringer tried out with a bar in front which to her gave it the appearance of Exhibit "O," but we now know it was not the toggle release wringer Exhibit "O" which she identified in her deposition.

Onck in his deposition gave the impression that he was called on the telephone and gave such detailed information that he was asked to come to Cincinnati, did so, discussed the nature of the testimony, and then appeared to testify.[87] When asked whether Dasbach was present, he gave answers which would leave the impression that he had not been concerned about the other witnesses.[88] He now admits that Herbsleb told him there were no Corcoran Com-

[78] Plaintiff's Exhibit No. 155. Dasbach's Deposition (Q. 279 et seq.).

[79] Plaintiff's Exhibit No. 137. Joseph Dasbach's Testimony (Q. 184, Page 107, et seq.).

[80] Plaintiff's Exhibit No. 155. Dasbach's Deposition (Q. 138, Page 90, et seq.).

[81] Plaintiff's Exhibit No. 137. Testimony of Joseph Dasbach (Q. 237, Page 115, et seq.).

[82] Plaintiff's Exhibit No. 137. Testimony of Joseph Dasbach (Q. 242, Page 115, et seq.).

[83] Plaintiff's Exhibit No. 136. Testimony of Herman Onck (Q. 135, et seq.). Plaintiff's Exhibit No. 136. Testimony of Mrs. Sara Onck (Q. 26, et seq.).

[84] Plaintiff's Exhibit No. 137. Testimony of Virginia Morris (At Page 70, Q. 6, et seq.).

[85] Plaintiff's Exhibit No. 136. Testimony of Mrs. Sara Onck. (Q. 61).

[86] Plaintiff's Exhibit No. 136. Testimony of Mrs. Sara Onck. (Q. 67–73).

[87] Plaintiff's Exhibit No. 155. Herman Onck's Deposition (XQ. 188 et seq.).

[88] Plaintiff's Exhibit No. 155. Herman Onck's Deposition (XQ. 200 et seq.).

pany records;[89] that he discussed the matter with Dasbach in detail to find out what he could to tie to dates.[90] He was present at two supper meetings where most of the witnesses and possible witnesses were present[91] and with Kauffman present at least at one such meeting.[92] He went to Dasbach's home a number of times while assisting in the investigation.[93] There is a conflict as to whether Onck arranged to see the other witnesses[94] or whether Herbsleb did.[95] His only interest was to do the investigating work and get paid for it.[96] He considered that he was working for Herbsleb.[97] Herbsleb never showed him Jantz's earlier statement.[98] In searching for material he was aided by Herbsleb and Brueggeman.[99] He worked with Brueggeman to build up the case even though he now admits that he and Brueggeman " * * * didn't get along so hot."[100]

It is important to note the effort that was made to find some event that occurred in the Spring of 1932 which could be used as a tie-in date and which resulted in the unfortunate choice of April 10, 1932. "Sudie's" one offspring was given a special "build-up." In explaining why that particular cat was outstanding he stated, " 'Sudie' was not merely a beautiful animal, but the father of the cat was 'Bobby Cresco'; 'Bobby Cresco' was the father of 'Bobby Shafto'." [101] Yet as to another cat "Pee Wee," a registered cat with full pedigree, also with "Bobby Cresco" as the

father and born to "Sudie" on August 20, 1932,[102] he referred to it as "a little stray cat that we picked up." [103]

The above analysis of the false impression given by the deposition of Onck could be multiplied. It no longer appears as the disinterested unassisted statement of a distinterested person who was called on the telephone and then was called in shortly thereafter to testify.

All of the evidence before the Patent Office thus reviewed in the light of the new evidence now obtained, both in character and amount, carries thorough conviction that there was an arbitrary stepping-up of the Jantz date by one year; that when Jantz originally insisted on April 10, 1933, instead of April 10, 1932, he had some reason for stating that specific date and was correct. It now appears convincingly that there was a deliberate effort on Kauffman's part to step-up the date to antedate Etten's without regard to actual fact, and that Herbsleb and Lord kept unrevealed a great many factors, known to them, which they must have known would entirely alter the picture. No longer can it be said "We find nothing in the record impugning the credibility of said corroborating witnesses. * * * " [104]

## Summary

That there was a deliberate effort on the part of Lord, Herbsleb, and Kauffman to step-up the Jantz date of invention

[89] Plaintiff's Exhibit No. 136. Herman Onck's Testimony. (Q. 419 et seq., and Q. 152).

[90] Plaintiff's Exhibit No. 136. Herman Onck's Testimony (Q. 325 et seq., and Q. 52 et seq.).

[91] Plaintiff's Exhibit No. 136. Herman Onck's Testimony (Q. 333 et seq.).

[92] Plaintiff's Exhibit No. 136. Herman Onck's Testimony (Q. 89).

[93] Plaintiff's Exhibit No. 136. Herman Onck's Testimony. (Q. 341 et seq.).

[94] Plaintiff's Exhibit No. 136. Herman Onck's Testimony (Q. 358 et seq.).

[95] Plaintiff's Exhibit No. 27c. Herbsleb's letter to Lord, dated October 10, 1940.

[96] Plaintiff's Exhibit No. 136. Herman Onck's Testimony (Q. 391 and Q. 25 to Q. 36 inc.).

[97] Plaintiff's Exhibit No. 136. Herman Onck's Testimony (Q. 380 et seq.).

[98] Plaintiff's Exhibit No. 136. Herman Onck's Testimony (Q. 392).

[99] Plaintiff's Exhibit No. 136. Herman Onck's Testimony (Q. 52 et seq.).

[100] Plaintiff's Exhibit No. 136. Herman Onck's Testimony (Q. 156).

[101] Plaintiff's Exhibit No. 136. Herman Onck's Testimony (Q. 215).

[102] Plaintiff's Exhibit No. 103.

[103] Plaintiff's Exhibit No. 136. Herman Onck's Testimony.

"Q214 Now then, when you bred your cat later in 1932 the second time, you had a very famous offspring named 'Pee Wee', didn't you? Don't you remember 'Pee Wee'? A. No, that was just a little stray cat that we picked up; in fact, I don't recollect much of that name 'Pee Wee'."

[104] Etten v. Jantz, 142 F.2d 680, 683, 31 C.C.P.A., Patents, 1177.

and reduction to practice on behalf of Lovell Manufacturing Company without regard to the truth thereof, is apparent throughout these proceedings and certainly must be characterized as fraud in connection with the obtaining of a finding of priority in favor of Jantz and the subsequent issuance of a patent thereon.

While this conduct on the part of Lord, Herbsleb, and Kauffman was in my judgment reprehensible in the extreme, I am constrained under the circumstances of the case to deny plaintiff's claim for damages on the ground of conspiracy. I do find as a fact, however, that such fraud was a major contributing factor in the award of priority to Jantz and the subsequent issuance of a patent on his application by the Patent Office, furthermore I also find as a fact that the chief motivating forces throughout this entire build-up procedure were Lord and Herbsleb, both Attorneys but neither one a defendant.

The action here was brought to determine the priority of the claims between the two parties. The proceedings continued over a long period of time and finally reached the point where all parties agreed that the 4915 and 4918 suits were finished business and an order was entered on December 9, 1947, confirming this understanding.[105] In the light of this agreement and confirming order, defendant cannot now by dilatory motion be permitted to raise a question of which he was fully cognizant prior to the agreement and order, and which is not predicated on any newly discovered evidence.

As between the parties to this suit, the Court adjudicates the question of priority in favor of the plaintiff, Nicholas L. Etten.

The plaintiff may submit a decree for approval.

[105] "It is further understood that both parties hereto have concluded their respective cases as to the original and amended complaint and that no further evidence or testimony will be adduced herein in connection with the causes of action of said original and amended complaints."